## North Strabane Township v. Sedmak

*Albert J. Zangrilli, Jr., James H. McCune,* for plaintiffs.

*George E. Anthou,* for defendants.

BELL, *J.,* February 28, 1983—North Strabane Township is situated within Washington County having a population of approximately 8,400 residents and 27.4 square miles; it is designated as a township of the second class[1]. It is not our intent to editorialize at this point, but we would believe that no party involved in this matter could deny that the financial affairs of this township were run in a casual and slipshod manner. All of the facts, data and testimony produced by the 25 persons who testified over a six-day period confirm such an observation.

The sole issue confronting us is whether certain acts of malfeasance or nonfeasance on the part of the supervisors manifested "a perverseness which amounts to criminal or culpable indifference to offical duties"[2] so that North Strabane electors could successfully petition the court for their re-

---

1. Act of May 1, 1933, P.L. 703 Art. 1 §101, as amended, 53 P.S. §65101. Hereinafter, as a matter of convenience, the Code will be cited with the Purdon's Pennsylvania Statutes Annotate section number. For example, section 101 of the Code will be cited as Code §65101.

2. In Re Foltz Appeal, 370 Pa. 567 at p. 571.

moval. The court fully recognizes that public officials should not be dismissed simply because they do not achieve perfection in every minute detail of bureaucratic operation, that is "not occasioned by cupidity or pathological sloth", In re Shoef, 570 Pa. 567, 88 A.2d 871 (1952), and we are aware that the office held by defendants is a part-time position that does not offer much in the way of financial compensation.[3] However, we are likewise aware that the Supervisors of North Strabane Township are responsible for a budget of approximately one million dollars and that the degree of care with which they perform their duties will affect, to a very large extent, the lives of township residents.

The genesis of this lawsuit might be said to be the consistently late filing of township audit reports and yearly budgets. Well into the 1981 fiscal year, the township's budget and the previous year's audit report had still not been completed by Cypher & Kight.[4] At this time a strike by township employees occurred and lasted for six weeks. Attendance at the monthly supervisor meetings swelled during this time and the supervisors testified that the meetings

---

3. Code §§65512, 65515.

4. Cypher & Kight is an independent and court appointed firm that was responsible for conducting an audit of the township's financial affairs for the years in question. The members of this firm testified that their audit was hindered by Mrs. Shirley Pierchalski, the township manager, who would prevent them from seeing the township's books and records. The supervisors were contacted by the auditors, but only more delay and procrastination resulted. The 1980 audit was finally completed on February 4, 1982. The 1981 audit was completed on May 3, 1982. The auditors described the township books and records as being a "mess".

were disrupted by what might easily be called an irate citizenry. A non-profit corporation calling itself "The Concerned Citizens of North Strabane Township" was formed, and members of this group as well as other residents attempted to secure copies of minutes of past supervisor meetings as well as other township records. The supervisors objected to the unannounced arrivals and demands of these individuals and discussed the matter with the township solicitor. In a display of careful office cost analysis that is noticeably absent in their other actions, the township supervisors (with the advice of the township solicitor) decided to impose certain restrictions and limitations on the time and use of office personnel, records and equipment before any concerned citizens could make reproductions.[5] Understandably, these actions were viewed by the citizenry as a "stonewalling" tactic and served only to draw an increased amount of attention to the affairs of the township.

The audit report for the year ending December 31, 1980, complete with findings and recommendations was completed by Cypher & Kight on February 4, 1982, a period far in excess of that allowed for under applicable law.[6] Mrs. Shirley Pierchalski, the township manager, committed suicide on March 8, 1982. The audit report fo the year ending December

---

5. The Concerned Citizens group did hire local counsel (Atty. McCreight) to help them obtain pertinent records and information. According to Mr. McCreight's testimony there was an attempt made on his part to comply with the request for an orderly manner in which the reproductions could be made. However, the supervisors imposed such restrictions in time and costs for reproduction that, in effect, the permission was a nullity.

6. Code §65547 — March 1 of each year.

31, 1981, was completed by Cypher & Kight on May 3, 1982. It was at this time that Cypher & Kight notified the office of the Auditor General of the Commonwealth, requesting that they conduct an independent audit in order to determine the full amount of unaccounted for funds previously identified by the township auditor, and in order to determine the status and disposition of police pension funds (which in past years were identified by the Auditor General as having been improperly deposited into the township's general account).

On June 11, 1982, and prior to the release of the Auditor General's report (September 15, 1982), a petition was brought by at least five per centum of the registered voters of the township pursuant to Code §65503. That section provides, in pertinent part, as follows:

"If any township officer[7] refuses or neglects to perform his duties the court. . ., upon complaint in writing by five per centum of the registered electors of the township, may issue a rule upon such officer to show cause why his office should not be declared vacant and another appointed in his stead . . . Upon hearing, and proof that the facts alleged in the complaint are true, the court may declare the office vacant and appoint another in his stead, to hold office during the term of the officer deposed, or to make such other order as to the court may seem just and proper."

Defendants, Joseph Sedmak, Michael Kavoulakis, Victor Rubis, James T. Maggi and Henry J. Hervol, were the Supervisors of North Strabanee Township

---

7. A township supervisor is a township officer. Code §§65402 and 65410.

during the year 1982, and, except for James T. Maggi, they were the supervisors during 1981 and 1980.[8] During these two years, one Stephen Vasko served as a supervisor instead of James T. Maggi. Defendants admit that the complaint was brought by "in excess of five per centum of the registered electors of the township" and that "the township was at all times material hereto a second class township."

At this point, we would like to summarize the findings of the township auditors for the 1980 and 1981 fiscal years, as well as the Auditor General's report for the 1981 year. This court is adopting the findings of these auditors as fact, since the defense did not attack the truthfulness of these findings but only offered what might be characterized as mitigating evidence.

---

8. Plaintiff's exhibit NN denotes the supervisors and the Board Chairman of North Strabane Township during the years 1977 through 1982:

| 1982 | 1981 | 1980 |
|---|---|---|
| Sedmak | Sedmak | Sedmak |
| Kavoulakis | Kavoulakis* | Kavoulakis* |
| Rubis | Rubis | Rubis |
| Maggi | Vasko | Vasko |
| Hervol | Hervol | Hervol |

| 1979 | 1978 | 1977 |
|---|---|---|
| Mals | Mals | Mals |
| Maggi* | Maggi* | Maggi* |
| Rubis | Rubis | Rubis |
| Vasko | Vasko | Vasko |
| Hervol | Hervol | Hervol |

* Denotes Chairmen.

I

On February 4, 1982, the township's audit report for the year ending December 31, 1980, was completed. The report included seven findings:

(1) The township overpaid withholding taxes to Internal Revenue Service (IRS) in the amount of $8,950.16 for the second quarter of that year.

(2) The failure to file returns, deposit taxes and payment of taxes on time to IRS resulted in the loss of $14,000 in penalties and interest. Significantly, the township auditors in their preaparation of the 1979 township budget warned the supervisors of the potential consequences of this dereliction. Obviously, their warnings were not heeded. the township manager entered into a settlement agreement with the IRS on September 25, 1980, to pay off assessed penalties and interest in the amount of $20,063.19. The supervisors, however, claim that they were neither notified nor aware that such an agreement had been reached.

(3) Transfers between funds were made without prior board approval and without the recording of such actions in the minute books.

(4) Late posting of books and records delayed the completion of the audit.

(5) Transfers from special accounts[9] to the general account were made in order to invest money in

9. The Township's 1980 budget included 13 mills of special tax levies. These levies were for specific pre-determined expense and assessments (e.g. — Indebtedness, Machinery, Public Safety Building, Fire Hydrant). These special accounts are restricted under Code §65902A(5) in that "The supervisors may by resolution, transfer unencumbered moneys from one township account to another, but no moneys shall be transferred from the fund allocated for the payment of debts or from any fund raised by a special tax levy for a particular purpose. Such transfer shall not be made during the first three

a common certificate of deposit. Upon the maturity of the certificate, the invested money was returned to the respective accounts; however, the interest that was accrued on the certificate was retained in the general account. The checks involved in these transfers were signed by the township manager and two supervisors. Board minutes did not show that any authorization for these transfers existed. The auditors of Cypher & Kight testified that they informed the supervisors of this finding, and that their response was one of surprise. It is the court's understanding from both Cyper & Kight's testimony as well as through subsequent testimony (including that of the supervisors themselves) that, apparently, the township manager was given carte blanche, in almost a literal as well as figurative sense, to effectuate these transfers.[10]

(6) Similarly, on a check signed by the manager and at least two supervisors, $5,000 from the Fire Hydrant Account, a special account, was transferred to the General Account. Board minutes did not reveal any authorization for this action; further-

---

months of the fiscal year. No money shall be paid out of the township treasury except upon appropriation made according to law."

10. The testimony of Supervisor Sedmak shows that in 1980 it was determined that three supervisors would sign each check. (According to Sedmak, the township manager would sign every check and leave room for two supervisor's signatures.) From the testimony it is evident that the supervisors signed checks without any knowledge, notation or documentation of what the checks were for. Supervisor Sedmak reports that he would put little checkmarks next to his name on "questionable checks" to alert other supervisors. How this operated as a system of internal control, we cannot understand. Furthermore, no other supervisor ever did question Mrs. Pierchalski or Mr. Sedmak about the "checked checks".

more, at the completion of this audit the funds were still not returned to their proper account.

(7) As the 1979 audit report indicated, funds were not appropriated in the budget for various expenditures.

## II

The township audit report for fiscal year 1981 was completed on May 3, 1982, and shows both a continued lack of organization as well as a complete disregard for previous audit recomendations and legislatively mandated rules of administration. The 1981 audit revealed that:

(1) The duties of the earned income tax collector were integrated with the duties of the township manager, thereby creating an internal control problem.

(2) The Fire Department's annual audit report could not be located at the township office. State law requires that annual audit reports of fire departments be submitted each year at the township's office.

(3) Funds were transferred from special millage accounts in violation of §65902A(5) of the Code. Specifically, in March of 1982, $21,656.35 was transferred from the Machinery Account, and $17,856.00 was transferred from the Municipal Building Account to meet the payroll. Of significance is the fact that this was accomplished by Board action and approval. (See Sedmak, T. Hervol, T.     ). The checks involved in these transfers bore the signatures of the township manager, a bank officer and a supervisor. These transfers, as well as those in 1980, are in violation of the provisions of the Second Class Township Code regardless of whether actual loss to the township results.

(4) Money was transferred from the Machinery and Municipal Building Accounts to the General Account for investment in a common certificate of deposit. The invested moneys were returned to their respective accounts; however, the interest was retained in the General Account. It is distressing to note that this transfer is separate from those made in 1980 and reported in the previous audit.

(5) Late postings delayed the completion of the yearly audit, and, additionally, it was noted that no postings for the year 1982 were made at the time of the audit.

(6) On November 19, 1981, the township received approximately $103,000 from the Commonwealth for its police pension fund. This money was co-mingled with General Account funds and was used to cover general Account expenditures in direct violation of the mandatory provisons of the Act of May 12, 1943, P.L. 259 §2, as amended, 72 P.S. §2263.1 (D):

"All moneys paid to the treasurer of any municipality or county shall be forthwith paid, or credited, to the pension or retirement fund, or the premium on the pension annuity contract, as the case may be, to provide pension retirement or disability benefits for the policemen of such municipality or county, or the dependents of such policemen. All moneys paid into the State Employees' Retirement Fund shall be credited, in equal proportions, to the State annuity accounts of the State Police who are contributing members to such fund."

This violation was reported by Cypher & Kight to the Auditor General of Pennsylvania who then conducted an independent audit of the township. At trial, the defendants testified that they were surprised that funds were being wrongly deposited in spite of

the fact that prior audits warned them of these practices.

(7)  Despite repeated warnings in the 1978, 1979 and 1980 audit reports, late filing and late payment of withheld employee taxes resulted in penalties and losses in the amount of $8,002.94. Furthermore, there was no sign, at the conclusion of the audit, that this course of conduct had ceased.

(8) Various categories of income could not be reconciled and funds could not be accounted for.

(9) The township manager who was paid a straight salary apparently overpaid herself on some weekly checks. Payroll checks were signed by the township manager herself and two supervisors. Supervisor Hervol testified that extra pay for the late manager was authorized by a letter issued from the Board. However, this letter was not produced nor did any minutes record such an authorization.

(10)  Payroll records were not properly posted to the books and records for the year 1981.

(11) In 1981, the Commonwealth assessed the township $981.43 in interest and $3,937.28 in penalties for late payment of employee taxes withheld for the year 1980 and 1981. Although assessed, those penalties and interest charges were still not paid to the Commonwealth at the conclusion of the audit.

Lastly, while not a finding, the auditors of Cypher & Kight were "distressed" to learn that the township's commitment to impound township records had been violated when a township employee entered the room set aside for impounding purposes and removed some records, including, but not necessarily limited to the receipt books for the Fire Hydrant Assessment tax. At trial it was admitted by one of the supervisors that records were taken from the room, but only for the purposes of discovering

whether a local taxpayer, who was then at the office, had or had not paid his tax.

### III

The Auditor General's audit report, undertaken at the request of Cypher & Kight revealed the following facts which were substantiated by the testimony and evidence given during the trial. We note that there will be some overlapping between the findings of Cypher and Kight and those of the Auditor General.

(1) Cash receipts were not deposited in the township's bank accounts or recorded in financial statements and cannot be accounted for. At least $9,227 of cash received in 1981, and $846 during the first three months of 1982 is missing and cannot be accounted for. The $9,227 represents approximately 35 percent of the total cash collected by North Strabane Township during that year.

(2) North Strabane Township pays the Canonsburg-Houston Joint authority (CHJA) for sewage treatment services on waste materials that flow through North Strabane sewage lines. As of July, 1982, North Strabane Township owes CHJA $172,820 which includes $103,690 of delinquent sewage treatment payments and $69,130 of interest expense.[11]

---

11. The testimony of Attorney Michael Kusturiss, the Solicitor of North Strabane Township for the year 1980, as well as other exhibits and testimony, reveals how $69,130 of excess costs resulted. On March 31, 1980, the Borough of Canonsburg increased its rates and it would be necessary for North Strabane Township to amend their ordinance in order to revise their rates. Mr. Kusturiss contacted Chester Engineers and asked that a new, revised schedule be drawn up. On April 21, 1980, Mr. Kusturiss received the new rates and incorporated it along with other pertinent data into an ordi-

Furthermore, delinquent customer accounts of approximately $40,000 incurred from 1973 to 1982 were not collected.

(3) Police pension funds as previously stated are regulated by the provisions of the Act of May 29, 1956, P.L. (1955) 1804, as amended, 53 P.S. §767 et seq. (commonly referred to as Act 600). By resolution, the township supervisors established in 1974 a police pension fund and a committee to administer the plan as provided by statute. Yet, the township supervisors did not appoint any member to the committee. Furthermore, in accordance with 72 P.S. §2263.1 (D), Commonwealth allocations to municipalities for police pension funds must be paid and credited to a pension fund. The Commonwealth's 1977 allocation of $21,156 was deposited in the township's general fund and not transferred until two years later. The audit report indicates that while

---

nance. The ordinance was passed in July of 1980, which might not be an unreasonable delay since there must be publication which has to correspond with the next regular meeting date of the board. However, after the ordinance was passed, it was the duty of the township secretary to notify the billing agent, in this case the water company, of the increase (Mrs. Pierchalski was both the Township Secretary-Manager as well as the secretary-treasurer of the municipal authority). Defendant's Exhibits 4 and 5 reveal that on February 8, 1981, the water company wrote to Mrs. Peirchalski, indicating that they had not received the rate increase information.

While the most flagrant dereliction of duty on this issue seems to be with Mrs. Pierchalski, we cannot help but recognize that the "general supervision of the affairs of the township shall be in the hands of . . . township supervisors. Certainly, the individual supervisors could have seen from their own household bills that they were not being billed under the increased rate which they had passed. The failure of the supervisors to check on whether the township was being run correctly, denied North Strabane Township needed revenues.

the funds were improperly retained for two years in the general fund, only one year of interest ($1,269.00) was transferred to the appropriate pension fund. Similarly, the 1978 Commonwealth allocation of $26,624 was also deposited into the general fund. In a previous Auditor General report, this misapplication of funds was noted and asked to be corrected. This breach was corrected and the funds properly transferred in 1981, approximately two years after the release of the Auditor General's report. Interest income lost to the pension fund ($3,993) was soon deposited into the fund. Allocations to the township of $103,646 during the years 1979, 1980 and 1981 were also deposited into the general fund. Actuarial studies indicate that $10,728 of interest income could have been generated if the pension funds were deposited into interest bearing accounts. In all, the mismanagement of the fund and the disregard for the law, resulted in a minimum loss of $15,990 to the recipients of the fund.

(4) Funds raised by special tax levies for particular purposes (e.g. fire hydrant and street lights) in the amount of $25,850 were transferred to the general fund or were paid directly to general fund expenditures in violation of §902(A)(5) (see footnote 9) of the Code.

(5) The supervisors signed blank checks which did not indicate either the payee or the amount of payment. This procedure enabled the township manager to pay herself $7,373 in excess of the approved budget salary of her position. There is some indication from the supervisors' testimony that this "raise" was approved by the supervisors, but there is no record of such an understanding.

(6) The township's 1981 payroll records are inaccurate and approximately $7,050 of payroll taxes

withheld from employees was not remitted to the Internal Revenue Service. The failure to make timely remittances to the IRS may result in penalty and interest expenses.

(7) North Strabane Township overpaid $2,571 in unemployment compensation contributions during 1981.

(8) The supervisors purchased health and life insurance policies for themselves using $1,753 worth of funds that are not authorized for this purpose, 53 P.S. § 65713, see also In re Hendrick v. East Rockhill Twp., 1 D.&C. 3d 763 (1977).

(9) Employee health insurance coverage was in effect before the election of the present supervisors. The supervisors permitted this coverage to remain in effect and also paid $1,061 in duplicate coverage.

(10) Inaccurate budget preparation resulted in improper fund transfers and late payments for the 1981 year. For example, prior year expenses of $104,000 were paid in 1981 but not included in the budget. Of these expenses, $21,283 was for penalties and interest for not properly depositing employee withholding taxes. Budget revenues of $21,419 were not received. Lastly, budget was undervalued in that actual expenses of $145,000 were in excess of budgeted costs.

(11) Checks were deposited into wrong accounts.

(12) Funds that were collected by a special tax were put into an account for the exclusive purchase of road machinery. In derrogation of the law, $3,691 was taken from the road machinery account and used for the purpose of an office copier.

(13) Money was pooled from six accounts and used to purchase a $10,000 certificate of deposit. The interest was retained in the general account

rather than being re-deposited into the various accounts from which they were taken.

(14) Real estate tax receipts were not deposited into interest bearing accounts. Proper management of this money could have earned township interest income.

(15) Lastly, it was noted by the auditors that North Strabane Township did not have adequate wage tax collection procedures established at the time of the audit.

Summarizing, a number of departures from the Second Class Township Code occurred from the late 1970's through present day. The violations of the mandatory duties that are incumbent upon supervisors include: (1) illegal payments to fire companies without having first received or in losing the fire department's annual report, §§ 65702, 65704; (2) illegal transfers from restricted funds, §65902A (5); (3) failure to prepare and adopt a timely budget, §65902A (1); (4) failure to furnish information to township auditors §65518; (5) illegal purchase of health and life insurance policies by the Supervisors §65713; (6) illegal use of road machinery funds §65912; (7) improper use of state funds (Act 600); (8) denial of access to township records, Act of June 21, 1957, P.L. 390, 65 P.S. §66.1 et seq. at §§65513 and 65532.

We hope that the dearth of cases on removal of township officers is an indication of the conscientiousness of local elected officials. However, we are not satisfied that the conduct of the defendants before us shows any such concern for duty. In fact, the Pennsylvania Supreme Court has upheld the removal of township supervisors for far less than was manifested by the defendants in this case.

Throughout these proceedings, it has been the contention of the defendants through their testimo-

ny and argument of their counsel, that the actions of the Township Manager, Shirley Pierchalski,[12] are the reason for the chaos of the township. It is also apparently believed by the defendants that ignorance of the law and of Mrs. Pierchalski's conduct, coupled with the fact there is no evidence that the supervisors personally received any financial gain should somehow absolve them of blame.

While we are satisfied at this point that no fraudulent activity on the part of the supervisors took place in the township's office over the past few years, these arguments do no more than explain how the financial affairs of the township deteriorated and do not amount to the level of legal justification.

In Crane's Appeal, 344 Pa. 624, __ A.2d __( ) which involved an action brought under Code §65503, the Supreme Court upheld the lower court's vacation of the office of supervisor, where the board had failed to file its budget with the Department of Internal Affairs, it being determined that this was a mandatory duty. Interestingly, the supervisors in Crane argued that this duty "was left in the hands of the Township Solicitor, now deceased", but the Supreme Court rejected this position stating,

"It is obvious that respondents cannot be excused for failure to perform a mandatory duty imposed by law upon them, by an averment that the matter was left in the hands of the Solicitor . . . *When a public official entrusts the performance of one of his duties to a subordinate, he must exercise his supervisory*

---

12. Mrs. Pierchalski was appointed township manager in December, 1975. She held the position of township secretary prior to to that year. Her duties and powers are set forth in a Township Ordinance which was submitted as Defendants' Exhibit No. 7.

*power to see to it that the duty is discharged."* (Emphasis ours.)

See also Milford Township Supervisors Removal, 291 Pa. 46 (1927); Ivey v. Cockerham, 9 Chest. 262 (1960).

Also, and more recently, In the Matter of The Franklin Township Board of Supervisors, 425 Pa. 65, 379 A.2d 874 (1972), reh. den. (1977), now Chief Justice Roberts affirmed the decision of the Court of Common Pleas of Greene County (Toothman, J.) and removed the supervisors of Franklin Township from office. The charges against the Franklin Township supervisors were only six in number. And, interestingly enough, the principal defense of two of the supervisors were that the actions of the third supervisor was the reason for their troubled finances. Judge Toothman responded to their contentions saying:

"The answer to that is very quickly found in the fact that had the board been conducting its meetings as it should have, and acting upon township business in the form prescribed by law, incurring its obligations and paying its bills by board action in accordance with sound budget practices, no one supervisor could ever have succeeded in causing such financial chaos."

The Greene County Court found the six allegations proven[13] and ordered the removal of the super-

---

13. The Supreme Court quoted the allegations of the Complaint in its option. 475 Pa. at 70, n.4. These allegations may be summarized as follows: withdrawal of monies from restricted funds in order to repay a tax anticipation loan, withdrawal of monies from restricted funds to meet the township payroll, failure to create a sinking fund in order to pay off a tax anticipation loan, failure to keep proper minutes of the supervisors' regular meetings, failure to keep and present a treasurer's report at regular meetings and failure to report bids in excess of $1,500.

visors from office. The Supreme Court of Pennsylvania affirmed the trial court in all particulars pertaining to the sufficiency of the grounds for removal, finding that the failure of the supervisors to keep adequate minutes of township proceedings and accurate accounts of township finances were legally sufficient to justify a removal. In a footnote, the court found that "Because (of these findings), we need not address the other reasons for removal relied on by the trial court." 475 Pa. at 82, n. 33.

This court realizes that §6503 of the Code gives us some degree of latitude in dealing with supervisor removal in that we can ". . . make such other order as to the court may seem just and proper." Possibly, if the record revealed that Mrs. Pierchalski was the sole cause of the financial trouble and if the supervisors had no knowledge of her conduct, we might be inclined to only chastise the supervisors for failing to place internal controls and safeguards into effect and impose some court supervision on their future dealings. But we believe that this remedy is not warranted in the case before us, as we are most forcibly affected by the revelation that the supervisors of North Strabane Township had knowledge that their manager was unable to perform her duties within the framework of the Second Class Township Code, and, furthermore, the supervisors had knowledge (or should have had knowledge) that their own actions were in violation of the Code.

A review of the record of this case discloses that for years preceding the resignation of Mrs. Pierchalski (March, 1982) and preceding the release of the 1980 and 1981 audits, the supervisors were aware that the financial affairs of the township were not being discharged with the utmost scrupulosity. While we do not mean to attack the character of one who is not here to defend herself, we note

that the supervisors' testimony shows that they believed Mrs. Pierchalski was "shrewd", "clever", a "manipulator", and, accordingly, should have been watched more closely by them. (Kavoulakis, T. , ; Sedmak, T. , , , ). For instance, and this is by no means an exhaustive list, there was knowledge in 1980 and 1979 that: taxes were not being paid to the IRS; funds were intermingled; budgets, reports and minutes were not prepared on time; money was owed to Canon-McMillan Authority, other contractors, and Mrs. Pierchalski lied to the Board about the status of these obligations; and that the payroll was being met by monies being transferred from restricted funds. (See, Sedmak, T. ; Hervol, T. ; Kavoulakis, T. ; Kusturiss, T. ). Also, there is evidence to the effect that all of the Board of the township manager's machinations and even discussed releasing her as early as January, February, 1980 (Sedmak, T. ; Kavoulakis, T. ; Kusturiss, T. ).

Despite such ample evidence that Mrs. Pierchalski was either overworked, had too many responsibilities, or was simply not capable of performing her duties according to the Township Code, the members of the Board did nothing to rectify the situation that existed, either because they somehow "trusted Shirley" (e.g.—Hervol, T. ) or because they simply didn't care enough. Mrs. Pierchalski's services were not terminated, her myriad duties were not delegated to others, nor was she placed under any form of internal control (other than the feeble gesture of placing check marks on questionable drafts). The abdication of responsibility and non-feasance of duty on the part of the supervisors in this case is complete. Mrs. Pierchalski

was allowed to edit and screen incoming mail and bills (Sedmak, T.          , Kusturiss, T.          ), and her control of the office was extended so far that supervisors would be sent out to work on the roads so that they "would not be in the way" (Sedmak, T.          ). The upshot of this continued abdication of duty and control was that at the actual date of trial, some supervisors were still unaware of the depth of the financial morass they were in or did not know when, by law, they were obliged to submit audit reports (Hervol, T.          , Rubis, T.          ).

Regarding Mr. Maggi, who was not a supervisor during the years 1980 and 1981, we are of the opinion that his failure while a supervisor in 1979 to prepare the 1980 budget within the allotted time, Code §65902A (2), and the failure to create a sinking fund for the construction of the municipal building, 53 P.S. §6780-451, and the misapplication of police pension funds for the years 1977 and 1978 (plaintiff's Exhibits O and Q) would justify his removal under the reasoning of Franklin Township. It is our belief that the method in which township business was run was of a continuing nature since the mid-1970's and that the items identified in the 1978 and 1979 audits should have put Mr. Maggi on notice as to the state of affairs existing at the township. His apparent inclination not to do anything to rectify the state of affairs in the township constitutes a nonfeasance of the office.

We would reiterate that we do not feel that any of the defendants involved in this matter derived any personal benefit throughout this episode, but we do not feel that the absence of personal gain can condone the manner with which they have discharged their duties. The court is aware that we all must af-

ford public officials some reasonable degree of tolerance in the performance of their duties to allow for errors in judgment and to allow for the exercise of discretion. However, the gross informality and indifference that these supervisors brought to their office, coupled with the resulting financial loss to the township and the complete collapse of the public trust, compels their dismissal. Citizens' confidence and trust in public officials, township or otherwise, are essential ingredients for the preservation of effective self-government. The framework and body of municipal law does not permit the courts to tolerate or overlook the flagrant, multiple and culpable abuses of the law as herein enumerated. Such toleration would utterly destroy the confidence and trust the citizens must have in their elected officials. The court, accordingly, issues the following.

## ORDER

And now, this February 28, 1983, the court finds the conduct of the five Supervisors of North Strabane Township demonstrates a perverseness which amounts to culpable indifference to their official duties, and, therefore, it is ordered and decreed that the five offices of North Strabane Township Supervisor are declared vacant, the said vacancy effective within ten days from the date of this order, unless exceptions are sooner filed. Further, it is ordered that the Clerk of Courts of Washington County shall immediately accept petitions for the filing of the vacancies by appointment of the court.